Good morning, Your Honor. Jeremy Lieberman on behalf of Lee Plaintiff Webb from Pomerantz LLP. With the Court's permission, I'd like to reserve four minutes for rebuttal. Keep your eye on the clock. We'll try to help, okay? We'll do so, Your Honor. Your Honor, the really singular question before this Court is that with a holistic view of the pleadings, do they rise to a strong inference of scienter? To put it even more succinctly, is it more likely or not that this accounting misstatement was a result of either recklessness or knowing falsity or just really an honest mistake? And that's really the fight here and the debate between the parties, Your Honors. And really what we have here is a scenario where SolarCity, right in the lead-up to its IPO, suddenly and fortuitously had a mistake in its calculation of gross margins and of allocable costs. Suddenly, its gross margins went from 2010 to negative 19 percent, 2011 to negative 14 percent, to magically 20 percent, positive 20 percent in 2012. The first three quarters, similarly very positive numbers from the company as opposed to a trend by the company and a history of the company of having negative gross margins. And the question is, was this mistake really just a happy coincidence that somehow benefited the company? Your Honor, we would say decidedly not, and we would argue decidedly not. Here, the timing of the misstatement is very suspicious, as the Court itself acknowledged.  Well, will you explain to the Court, in your view, how the, in quotes, holistic view of the scienter works? The factual information that you indicated seemingly would alert management, particularly core management, to this kind of a problem. And yet you have the confidential witnesses who seem not to have been there or didn't know or whatever. And we basically are thrown back on this concept of a holistic view of things. Tell us what case law, what facts, what should we be looking to to get you to where you think you need to be? Your Honor, we would say that a holistic analysis is where you, similarly as to what the Court had done, had looked at allegations regarding motive and opportunity, had looked at allegations regarding the size of the restatement, had looked at the allegations regarding the confidential informants, and really on each one found some excuse or found some benign explanation which kind of freed the company from any liability. And the question is, is when you look at these allegations as a whole, do they lead to the gut instinct, to the basic assumption that this company can we, at this point in the litigation, can we as a Court in effect rely on our gut as to what we see in terms of the negative results and gross margins of the sales division suddenly jumping up without anything more, and for the moment discounting what the contrary evidence might be. Is that enough for us to find that this case should move forward? Your Honor, I don't think we need to get there here because I think we have a lot more than just the pattern of the losses. We have a confidential informant, CW5 namely, who says when he was at the company, specified during the class period, there were discussions amongst management that he was present with, where they were discussing negative cash sales, negative margins. The thing that troubled me, I had a couple of things. One was the CW5 was referencing specific projects as opposed to the sales division. There wasn't, other than sort of generic, well, everybody had the same experiences with sales projects having negative numbers. There wasn't anything specific about the division as a whole. Is that right or is there other evidence that I haven't focused on? Your Honor, we think if you do look at paragraphs 41 through 45, he's discussing his own experience. So he said like 60% of his projects didn't do well, which meaning 40% did. So it's like hard to say, well, that means, to read from that, that means that everyone knew the entire division was having problems. No, but there's also discussions amongst with management discussing why cash sales generally are underperforming. Cash sales here means the sales segment. That's explicit from the 10-K. He says that he learned from talking to other people, other sales people at SolarCity also, right? He learned it from other people at SolarCity. He learned it in discussions with management, and management is telling employees stay away from cash sales, go into leases, because the margins of cash sales are too low. And that gets to my other question, which is the leases division was so much larger than the sales division. This gets a little bit into what the motive to hide the sales division number, a mistake, assuming they were aware of the mistake, when the lease division was so much larger, more important, more over the long term, more lucrative, and yet they were reporting $90 million loss for the company. So it wasn't clear to me how important the sales division was in the context of this IPO and the acquisitions and the like, which raises a question to me about they knew there was a problem and they hid it, they covered it up. I think with respect to pleading, giving the benefit to the plaintiff with respect to materiality, it's very fact-intensive, 60% of revenues recognized by the company on a yearly basis were from cash sales. That's sort of misleading, because it was the leases, even though they weren't recognizing the cash sales immediately, or the revenues immediately, I mean, the lease division, it appears from the record, was highly more lucrative, larger, and going to realize more as just more of an accounting thing. So it didn't seem like the 60% revenues made it that the, it was something that people cared about, investors cared about, it just wasn't clear from the pleadings. Your Honor, would you, as a result of the misstatements, gross profits for the company as a whole were overstated by $23 million, or 46%, so it's very hard to even on a factual... It wasn't like $90 million in the hole,  and how do we assume, or how do we infer that that's something that would make a difference to a decision to invest such that the defendants here would want to cover up the sales problems? If you look at the, if you see that earnings here, gross profits are being overstated by, it's $23 million, which was 46% with respect to 2012. That is material, and it's gross profit for the company as a whole. That's material wherever, however you look at it, whoever the reasonable investor is, that's material. And if you look at the allegation that... I'm sorry, Your Honor. Returning to Judge Akuta's question on the motivation, the IPO said that there were huge losses in 2012, 90-some million, and the accounting change would just increase those losses to 113 million. So what's the motivation? The motivation is, is if most of your revenues are coming from one source, 60% are coming from cash sales, and then you want to show that your business on a long-term basis is something that can last, it doesn't last if your gross margins on that business are down in the seller of 20%, or negative 20%, or negative 5%. It just simply is an unsustainable business model. And so what you'd be telling if the company came out with accurate financials is that on a quarter-to-quarter basis you can anticipate we're never going to make money. It's just simply not going to occur. So what did the district court do wrong here? I mean, she gave you three shots at it through continuing to amend the complaint, and then she wrote a very thorough opinion including holistic analysis as well as individualized analysis. What did she do wrong? What did she miss? What's crucial here that she missed or didn't give sufficient weight to? I think she, quote, unquote, did do a holistic analysis, but we don't think it simply didn't look at the overall picture here. The overall picture here is how does this company all of a sudden make this mistake right in the lead-up to the IPO? You have a miscalculation on the burden ratio. They know how to calculate the burden ratio in 2008, 2009, 2010. Whoops, all of a sudden they go public. They don't know how to do the burden calculation ratios. Actually, they just simply forget to put a number in the denominator magically. How does that happen? Well, I'm not sure that would be enough. Isn't your point more that when there was a change of 34%, they didn't notice it, but when there was a change the other direction of 7%, they did notice it? That certainly does add to it. The question is they said that all of a sudden they saw that it was inconsistent numbers in gross margins for the sales segment. They don't see that in the first quarter when all of a sudden they have 27% gross margins in the first and second quarters of 2012? They don't ask themselves a simple question, how in this very critical segment are we all of a sudden doing great? A closing counsel points to a paragraph in the complaint that says Ernst & Young also didn't catch this error. Is that incorrect? Your Honor, I'd have to look at it. I mean, certainly CW-5 says that Ernst & Young expressed concerns regarding the gross margins. But they didn't correct, they didn't catch the burden error at least. I guess perhaps they couldn't be expected to see that the jump in profitability was not expected. Your Honor, obviously at the end of the day, either Ernst & Young or the company in the second year did catch it. We don't have a complaint currently against Ernst & Young. Maybe at a certain point that would be appropriate. But right now we're looking just at the defendants here. And the question is, you see you've got negative 20% gross margins, or negative 14%, negative 19%. And this is a key segment. This is 61% of the revenues. And you don't ask yourself a simple question, geez, how are we making so much money now? And you have CW-5 in meetings with the executives where they're discussing negative margins while the company's reporting positive margins for the sales segment. Let me return to my original question, which is can you be successful just on a holistic analysis? As my colleagues have both indicated, when you start looking at the confidential witnesses and so on, and you look at Ernst & Young not picking it up and so on, there are a lot of things that suggest there's nothing wrong, you know, they had a problem. But it does smell. I mean, the huge change, the fact that Elon Musk had a lot of investment, a lot of things involved in trying to help him, family relations, it has a problem in that sense. But is that enough? Is there any case that you can cite me to that says that for purposes of pleading post-Iqbal that that's enough? We think basically South Ferry says you can look at allegations and you look at even imprecise or vague allegations, which we think we don't have here, and that can add to an overall picture. That's simply the Ninth Circuit saying if you look at individually, if you fail individually in the Verifone case, even if you might fail individually on various points, if you look at a holistic analysis and overall it leads to the conclusion that it's more likely than not that this was either reckless or knowing, then it's a win. It just has to be as plausible as the competing contention that or the competing story that nothing to see here. That's absolutely correct. So it's not that high a bar. Absolutely correct, Your Honor. And here actually, at a hearing, the Court actually said it is equally plausible that defendants were – it was innocuous. Well, if it was equally plausible, then actually it was a win. Now, it could be that the district court backtracked from that argument. That certainly was articulated. I'm running out of my rebuttal time. If you want to save some of your time, let's wait then. Yeah. All right. Come back for rebuttal. So we'll hear from counsel of the defense. Good morning. Good morning, Your Honor. May it please the Court. Ignatius Alcedo on behalf of the defendant's appellees. The district court properly dismissed the complaint, which was the third amended complaint, for failure to raise the required strong inference of scienter. The Supreme Court in the Tellab's case explained that the factual allegations to raise a strong inference have to be compelling, persuasive, and powerful. The district court, as Judge Bates noted, did an exhaustive analysis here, gave the plaintiffs repeated opportunities, had two lengthy hearings, issued three orders, and found that individually and also collectively in a holistic analysis, the allegations are not sufficient under Tellab's and also under this court's extensive teachings about the nature of what it is to raise a strong inference of scienter. But one of the most problematic points is that SolarCity says it discovered the accounting change when margin, sales margin, seems inconsistent. And that was when the margins appeared to drop by 7 percent in 2014. But didn't notice when the margins went up by 35 percent in 2011, from 2011 to 2012. How is it plausible that they wouldn't notice that huge increase, but then a modest decrease was what led to finding this? Well, Your Honor, I think that just doesn't seem plausible. Well, no, because I think that you're missing part of the story here. The plaintiffs have their 7 percent solution, so to speak. But if you look at page 45 of their brief. I think it's more of a 35 percent solution, but go ahead. Well, no, but you raise the 7 percent delta. And here they're talking about two quarters that happened before that are not the quarter when the issue was discovered. In the fourth quarter of 2013, the company did a number of things. And this is at Supplemental Excerpt of Record 33 where the company announces the issue and how it was discovered. And a key aspect of it was a new internal controls audit, which was a new requirement that the company had to meet. It didn't have to deal with an internal controls audit beforehand because the company was an emerging growth company. And you can see that on the cover of the prospectus, which is the first page of plaintiff's request for judicial notice. So the company was doing a new internal audit for purposes of Section 404 of Section 33 and discovered the error. And, yes, it looked at the fact that the numbers for the fourth quarter didn't quite look right, in part because it had a large uptake in the number of deployments that quarter. But there is no allegation whatsoever anywhere in the complaint that anyone at the company, not senior management, not the seven-person cost accounting team, not the auditors in Ernst & Young, even suspected that there was an error. And I thought my friend took an interesting step by saying, well, CW-5 said that Ernst & Young had concerns. I quickly looked over the paragraphs regarding CW-5. I don't think that, because Mr. CW-5 was not in finance. He was in sales. And, in fact, based on the discussion there, he doesn't really even seem to know how the company accounted for these overhead costs, because as Reggie said. I'm sure that the defendants knew. The burden formula mistake or the 35 percent jump? Well, number one, the burden formula mistake, nobody is alleged to have known. So it's really the 35 percent. Isn't it really the 35 percent jump that would put them on notice? Well, no. That's a different issue. But on the error, nobody is alleged to have known, even the people who were directly responsible for calculating the costs. And remember, we're talking about something truly in the weeds, because we're talking about a denominator of a formula that takes prior period and current period costs, and prior period and current period costs, and one of those variables was missing, created an accurate burden ratio, which was then multiplied. Yes, Your Honor.  The big change from whatever it was, minus 5 to plus 22, isn't that enough to alert someone that there's an error or that something needs to be further reviewed? No, Your Honor. Why not? And here, because Mr. Lieberman's entire theory of the case is that the company misstated its financial statements in order to go public. Their theorem is an illusion of profitability. And there are a couple of problems with it. First of all, as Your Honor noted, the company lost a lot of money. It was very clear that it lost over $75 million in the three quarters before the IPO. It lost over $90 million in all of 2012. And the ultimate revisions to the financial statements just added a few more dollars to that. But the company was never in a profitable position. But it's interesting that you mention the change in the gross margins of the sales segment. In 2010 and 2011, there were minus 19 and minus 11 percent respect. All right? And the plaintiffs say, oh, these magically became very profitable, where, in fact, it wasn't. But what the plaintiffs omit to tell you is that in the first quarter of 2012, in the run-up to the IPO, the margins on the sales segment were positive. And in the third quarter, immediately before the IPO, also the margins were positive. So, in fact, the trend line was consistent. It was getting better. Now, did the company have an error in its formula? Absolutely it did. And it discovered it and it corrected it. But nobody is alleged to have directed a manipulation of the data or had any inkling that the data was erroneous. And I think you have to take into account the relative importance of the sales segment versus the lease segment. And I think, Judge Ikuda, you raised this very clearly. The lease segment was over 90 percent of the company's installations. The lease segment is the overwhelming majority of the company. And although because of the accounting rules, revenue and costs are recognized up front in the very small sales segment, the overwhelming majority of the value comes in the lease segment. At the time of the IPO, those future lease payments were $831 million. At the time that the company announced its restatement, in March of 2014, those future payments were $2 billion. That is the focus of the business. That is where the value is. Now, what plaintiffs also have a very difficult time dealing with is the question of motive. And here I think it goes directly to the question you raised, Judge Smith, about the holistic analysis. And I think it's unfair to say that Judge Freeman below did not engage in a holistic analysis. As you noted, Judge Bates, she did. She looked at the factors individually and then looked at it collectively. And there is a requirement that this Court has to look at, which is that it has to look at both positives and negatives in terms of the holistic analysis. It has to look for facts which run counter to an inference of scienter. And here there is a crucial absence of any motive to defraud. The company went public, but that is not enough. This Court, in case after case, has said that ordinary corporate transactions are not enough. And also, notably- Well, they also point to acquisitions. There were two acquisitions, and there was also a desire to shield Elon Musk from a margin call. Those were the other two items. Well, first of all, acquisitions, again, ordinary course. And this Court has held, for example, in Lipton and in Zucco, that ordinary course transactions are not sufficient to raise a strong inference of scienter. And so let's talk about the stock. Is the purchase of another company of the sizes involved in ordinary course transactions? Well, those are private companies, and those are privately negotiated transactions. I get that, but it involves a lot of money compared to the size of this company. I mean, ordinary course, you know, calling Office Depot, I get that. But to buy a couple of pretty good-sized companies and use the proceeds of the IPO and then the follow-on sales to do so, is that really ordinary course? No. The proceeds of the IPO and the follow-on sales were not used for those. They were used for operating the company and the stock. Stock value. Yes. But let's talk about the stock, and let's talk about Mr. Musk, because I think a key point here is the absence of motive. So Mr. Musk, who's the chairman of the board, he's not a defendant here. He was dismissed, and the plaintiffs did not appeal the dismissal. He purchased 2.1 million shares of the company's stock at the market price. That is dramatically inconsistent. What percentage of his holdings of the company did that represent? He had approximately 18 million shares before the IPO, and I think it went up to 20. So basically, it's a relatively small amount of money that he used, vis-a-vis what he already had in there, right? Well, but the fact, though, is that usually, in the question of scienter, the analysis is the other way, where a large shareholder sells stock, and the question is, are those sales sufficient to trigger any concern? So, for example, in Your Honor's decision in the Align case a few months ago, Your Honor looked at that in the question of the sales engaged in by the CEO there and whether they were large and dramatic and out of the ordinary. Here, there are no allegations of sales. Not at all. And it's not only Mr. Musk who bought 2.1 million shares. Mr. Rive, the CEO, bought over 100,000 shares during the class period. Again, the notion that individuals would buy stock that they know is artificially inflated makes no sense, and the court has repeatedly held that the absence of a benefit from an artificial inflation of the stock is significant. I think the phrase has been used that where the insiders miss the boat so clearly that it militates strongly against the question of scienter. And Judge Ikuda, you raised the question of Mr. Musk's margin call, but there's nothing in the record. There's no allegation of any of the details of that. There was no margin call. Let me ask you this in turn. I'm sorry. Yes, Your Honor. Does the record tell us anything about the interactions of senior management with the people who were actually in charge of the accounting application structure of the sales division? In other words, how often did they meet with them? Where did they meet with them? Well, you've raised an excellent point, which is the complaint is devoid of allegations regarding the individual defendant's involvement in the accounting decisions, let alone the accounting decision at issue here and the accounting practice involving the allocation of overhead costs. With respect to involvement in, but there are some allegations from confidential witnesses about knowledge of those subjects, isn't there? No, no. The confidential witnesses don't seem to know anything about cost accounting and the allocation. They have very general allegations that the management team would interface, for example, with the controller of the company. And so, quote, unquote, they must have known. This Court has held repeatedly that those kinds of allegations are not sufficient and it is not enough to say that the management team is involved in the management. That's their job. And if that was sufficient, then every case would lead to scienter, because you — It just simply doesn't qualify under Iqbal, from your perspective. Well, but Iqbal — that's true, but Iqbal isn't the test. So, I mean, it's a much higher test. The test before this Court isn't the plausibility aspect of it called, but rather the strong inference of the Reform Act and the requirement of TALABs and this Court's many cases subsequent to that, that there be compelling evidence of fraudulent intent or conscious misbehavior. And so that aspect of things is entirely missing here. Do you think that the statements of the confidential witnesses who left the company before the start of the class period have to be disregarded entirely? I think — I don't know if it's disregarded entirely. This Court has taught very clearly that you look at the allegations, and the Zucco case in particular examines those allegations, and they don't carry very much weight. But there are many problems with the confidential witness allegations. Among them — But you don't — you're not arguing that they have to be disregarded entirely? I don't think that you need to disregard them entirely. Even if you take them entirely at face value, they don't get the plaintiffs anywhere. Because these CWs are not in a position to know, and in fact don't seem to know, anything about the cost allocation issue at all. None of them are in, for example, the seven-person group in finance who was responsible for doing this. But now we're back looking at this accounting mistake, whereas the thrust of the argument is that if everyone in your sales division says, every project I've worked on loses money, then shouldn't management understand that the sales division is doing poorly, and therefore these profitability numbers are wrong? But as Your Honor noted in the question to my friend, that isn't what the complaint says. The complaint only says that CW-5 had 60 percent of his projects with negative margins, and 40 percent, obviously, with positive margins. And he has no insight into the margins on the sales segment as a whole. And if you step back, the allegation that the segment as a whole had negative margins founders on the fact that in the first quarter of 2012 and the third quarter of 2012, the segment had positive margins. So the implication that they're trying to portray, which is that all of these projects had negative margins, is not only not supported in the complaint, but it's contrary because a portion even of CW-5's projects had positive margins, and of course, the segment as a whole in the first and third quarters of 2013 had positive margins. Kennedy. Can I ask my colleague if either has any additional questions? I think not. Thank you, counsel. Thank you very much, Your Honor. Thank you, Your Honor. And Your Honor had previously asked me is where did the court go astray, as it were, in its prior rulings. I think very key is that the court ultimately, while it looked at the allegations and essentially attempted to debunk them, the court was essentially requiring a smoking gun. It was saying that you needed somebody who was working in the overhead allocation department talking to one of the CEOs and ordering them to make the change. And we didn't have that, Your Honor. And that is correct. But ultimately, the question is, can you get through a scienter allegation absent that? And we do have the South Ferry says yes, Verifone says yes, and so does BP. We look at core operations, and core operations say, first of all, it's absurd to suggest that management wouldn't know otherwise. It is absurd here to suggest management wouldn't pick up very clearly within the first quarter and the second quarter of 2012 the drastic change of gross profits. But what it really gets down to, again, at least from my perspective, Counsel, is what I started with. It seems to me when you go through the CWs and the other information, it doesn't quite make it because, like opposing counsel says, CW5 has this little limited view like the people hanging on to the elephant. He knows a little bit about a little thing, but not necessarily the whole thing. It all gets down to holistic. And what do you need? How much do we need as judges in terms of a smell test to say, these are smart people. This is core management. This just can't be right. I'm struggling with it. I've got to be honest with you. I am really struggling with it because it's a good district judge, worked very hard, talked about the holistic. How do we review it? Use of discretion? What are we dealing with? It's DeNovo review, Your Honor. That's certainly the case. Okay, so we're dealing with DeNovo. Okay, and similarly, CW5 does get you there because CW5 is talking about management, meetings with management where they're saying, stay away from cash sales and go into leases. It's not talking about his projects. It's talking about – Is that your best argument aside from the general holistics is CW5? CW7 as well, talking about how there was 10 to 15 percent for leases, but it was far lower with respect to cash sales. So you do have multiple confidential informants saying, we're at meetings with management. They're talking about poor negative margins for cash sales, yet they're reporting at the same time positive margins. Okay. We thank you for your argument, both counsel. Very well done, and we appreciate it. Thank you. The case just argued is submitted, and we will get you a decision at the earliest possible date. The court's going to take a very brief five-minute recess, and then we will return. All rise. This court stands in recess for five minutes.
judges: M. Smith, Ikuta, Bates